E-FILED
Thursday, 10 January, 2019  04:00:32 PM
Clerk, U.S. District Court, ILCD

24,28,APPEAL,CLOSED,REFER,RULE 16 CONFERENCE HELD

# U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Urbana)
## CIVIL DOCKET FOR CASE #: 2:16−cv−02298−CSB−EIL

Aguero v. University of Illinois et al
Assigned to: Judge Colin Stirling Bruce
Referred to: Magistrate Judge Eric I. Long
Cause: 42:2000e Job Discrimination (Employment)

Date Filed: 09/27/2016
Date Terminated: 12/17/2018
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Alejandra Aguero**                     represented by   **Jonathan C Goldman**
                                                          Law Offices of Goldman & Ehrlich, Chtd.
                                                          20 S Clark St
                                                          Ste 500
                                                          Chicago, IL 60603
                                                          312−332−6733
                                                          Fax: 312−372−7076
                                                          Email: jon@goldmanehrlich.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ronald S Langacker**
                                                          LANGACKER LAW LTD
                                                          Suite 100
                                                          102 E Main Street
                                                          Urbana, IL 61801
                                                          217−954−1025
                                                          Fax: 217−903−5255
                                                          Email: ron@langackerlaw.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**University of Illinois**                represented by   **William J Brinkmann**
*TERMINATED: 03/30/2017*                                   THOMAS MAMER & HAUGHEY LLP
                                                          Suite 500
                                                          30 E Main Street
                                                          Champaign, IL 61820
                                                          217−351−1500
                                                          Fax: 217−351−2017
                                                          Email: wjbrinkm@tmh−law.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kenneth D Reifsteck**
                                                          THOMAS MAMER & HAUGHEY LLP

Suite 500
30 E Main Street
Champaign, IL 61820
217−351−1500
Email: kdr@TMH−LAW.com
*ATTORNEY TO BE NOTICED*

**Philip Jeffrey Pence**
THOMAS MAMER & HAUGHEY LLP
Suite 500
30 E Main Street
PO Box 560
Champaign, IL 61824
217−351−1500
Fax: 217−355−0087
Email: philip@tmh−law.com
*TERMINATED: 06/15/2018*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Board of Trustees of University of Illinois**   represented by   **William J Brinkmann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth D Reifsteck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan T Kolb**
THOMAS MAMER & HAUGHEY LLP
Suite 500
30 E Main Street
PO Box 560
Champaign, IL 61824
217−351−1500
Email: nkolb@tmh−law.com
*ATTORNEY TO BE NOTICED*

**Philip Jeffrey Pence**
(See above for address)
*TERMINATED: 06/15/2018*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/27/2016 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0753−2410235.), filed by Alejandra Aguero. (Attachments: # 1 Civil Cover Sheet)(Langacker, Ronald) (Entered: 09/27/2016) |
| 12/05/2016 | 2 | | |

| | | |
|---|---|---|
| | | MOTION to Dismiss *and Strike Pursuant to Federal Rule of Civil Procedure 12* by Defendants Board of Trustees of University of Illinois, University of Illinois. Responses due by 12/19/2016 (Brinkmann, William) (Entered: 12/05/2016) |
| 12/05/2016 | 3 | MEMORANDUM *OF LAW IN SUPPORT OF MOTION TO DISMISS* re 2 MOTION to Dismiss *and Strike Pursuant to Federal Rule of Civil Procedure 12* by Board of Trustees of University of Illinois, University of Illinois. (Brinkmann, William) (Entered: 12/05/2016) |
| 12/15/2016 | 4 | MOTION for Extension of Time to File Response/Reply by Plaintiff Alejandra Aguero. Responses due by 12/29/2016 (Langacker, Ronald) (Entered: 12/15/2016) |
| 12/16/2016 | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 12/16/2016. Plaintiff's Agreed Motion to Extend Deadline 4 is GRANTED. Plaintiff's deadline to file a response to Defendant's Motion to Dismiss is extended to January 9, 2017. (KE, ilcd) (Entered: 12/16/2016) |
| 01/06/2017 | 5 | Second MOTION for Extension of Time to File Response/Reply by Plaintiff Alejandra Aguero. Responses due by 1/20/2017 (Langacker, Ronald) (Entered: 01/06/2017) |
| 01/09/2017 | 6 | ORDER entered by Magistrate Judge Eric I. Long on 1/9/17 setting a Rule 16 Scheduling Conference for 2/28/17 at 10:30 AM in Courtroom B in Urbana before Magistrate Judge Eric I. Long. See written Order. (TC, ilcd) (Entered: 01/09/2017) |
| 01/09/2017 | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 1/9/17. Plaintiff's Second Agreed Motion to Extend Deadline 5 is GRANTED. Plaintiff's deadline to respond to Defendant's Motion to Dismiss is extended to January 30, 2017. (KM, ilcd) (Entered: 01/09/2017) |
| 01/13/2017 | 7 | REPORT of Rule 26(f) Planning Meeting by University of Illinois. (Brinkmann, William) (Entered: 01/13/2017) |
| 01/17/2017 | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 1/17/17. This Court has reviewed the parties' Report of Rule 26(f) Planning Meeting 7 and pursuant to the Order 6 scheduling this matter for a Rule 16 hearing conference by personal appearance on February 28, 2017, at 10:30 A.M., the matter is hereby converted from personal appearance to telephone conference on the same date at the same time. The Court will initiate the call. (TC, ilcd) (Entered: 01/17/2017) |
| 01/30/2017 | 8 | AMENDED COMPLAINT against All Defendants, filed by Alejandra Aguero. (Attachments: # 1 Exhibit, # 2 Exhibit)(Langacker, Ronald) (Entered: 01/30/2017) |
| 02/13/2017 | 9 | MOTION to Dismiss *Amended Complaint Pursuant to Federal Rule by Civil Procedure 12* by Defendant University of Illinois. Responses due by 2/27/2017 (Brinkmann, William) (Entered: 02/13/2017) |
| 02/13/2017 | 10 | MEMORANDUM in Support re 2 MOTION to Dismiss *and Strike Pursuant to Federal Rule of Civil Procedure 12* filed by Defendants Board of Trustees of University of Illinois, University of Illinois. (Brinkmann, William) (Entered: 02/13/2017) |
| 02/27/2017 | 11 | |

| | | | |
|---|---|---|---|
| | | | MEMORANDUM in Opposition re <u>9</u> MOTION to Dismiss *Amended Complaint Pursuant to Federal Rule by Civil Procedure 12* filed by Plaintiff Alejandra Aguero. (Langacker, Ronald) (Entered: 02/27/2017) |
| 02/28/2017 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 2/28/17. Plaintiff's Amended Complaint <u>8</u> , and Defendant's subsequent Motion to Dismiss <u>9</u> has superseded Defendant's earlier motion <u>2</u> . The clerk is directed to MOOT <u>2</u> . (TC, ilcd) (Entered: 02/28/2017) |
| 02/28/2017 | <u>12</u> | | MINUTES for proceedings held 2/28/17 before Judge Eric I. Long. Appearance for Plaintiff by Ronald Langacker. Appearance for Defendants by William Brinkmann, Kenneth Reifsteck, and Philip Pence. Rule 16 conference held by telephone. Plan approved; dates set. Consent to magistrate judge discussed (form attached). ADR options offered, including court−hosted settlement conference. The following discovery deadlines are set: Initial disclosure due by 4/10/17; Amended pleadings due by 6/30/17; Joinder of parties due by 6/30/17; Plaintiff's expert disclosure due by 10/31/17; Plaintiff shall make experts available for deposition by 11/30/17; Defendant's expert disclosure due by 12/29/17; Defendant shall make experts available for deposition by 1/31/18; Discovery due by 7/31/18; Case dispositive motions due by 8/31/18. Final Pretrial Conference is scheduled for 1/7/19 at 1:30 PM by personal appearance before Judge Colin S. Bruce, Courtroom A, Urbana, IL. Jury Selection/Jury Trial is scheduled for 1/15/19 at 9:30 AM before Judge Colin S. Bruce, Courtroom A, Urbana, IL (5 days). Status Hearing set before Judge Long on 5/16/17 at 11:15 AM by telephone to discuss possible court hosted mediation or summary trial. (Tape #UR−B 10:31 AM.) (KM, ilcd) (Entered: 02/28/2017) |
| 03/30/2017 | <u>13</u> | | ORDER entered by Judge Colin Stirling Bruce on 3/30/17. The University's Motion to Dismiss <u>9</u> is GRANTED in part and DENIED in part. The motion is granted as to the University of Illinois. The clerk is directed to terminate the University of Illinois as a defendant, leaving only the Board of Trustees of the University of Illinois as a defendant. The motion is granted as to Counts V and VI. Those counts are dismissed. The motion is DENIED in all other respects. This case is referred to the magistrate judge for further proceedings in accordance with this order. See written Order. (KM, ilcd) (Entered: 03/30/2017) |
| 03/31/2017 | <u>14</u> | | CERTIFICATE OF SERVICE by Alejandra Aguero (Langacker, Ronald) (Entered: 03/31/2017) |
| 04/10/2017 | <u>15</u> | | CERTIFICATE OF SERVICE by Board of Trustees of University of Illinois, University of Illinois (Brinkmann, William) (Entered: 04/10/2017) |
| 05/05/2017 | <u>16</u> | | ANSWER to <u>8</u> Amended Complaint by Board of Trustees of University of Illinois, University of Illinois.(Brinkmann, William) (Entered: 05/05/2017) |
| 05/16/2017 | | | Minute Entry for proceedings held 5/16/17 before Magistrate Judge Eric I. Long. Appearance for Plaintiff by Ronald Langacker. Appearance for Defendant by William Brinkmann. Status Conference held by telephone. Status of case discussed. Status of discovery discussed. Option for settlement offered. Status Conference set for 10/17/17 at 10:00 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR−B 11:19 AM.) (TC, ilcd) (Entered: 05/16/2017) |
| 05/18/2017 | <u>17</u> | | CERTIFICATE of Service/Counsel *of Interrogatories and Request to Produce to Plaintiff* by William J Brinkmann on behalf of Board of Trustees of |

| | | | |
|---|---|---|---|
| | | | University of Illinois (Brinkmann, William) (Entered: 05/18/2017) |
| 05/19/2017 | 18 | | MOTION for Protective Order by Plaintiff Alejandra Aguero. Responses due by 6/2/2017 (Langacker, Ronald) (Entered: 05/19/2017) |
| 05/22/2017 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 5/22/17. Plaintiff's Motion for Protective Order 18 is GRANTED. The Court will enter the parties' agreed protective order as a separate entry in this case. (TC, ilcd) (Entered: 05/22/2017) |
| 05/22/2017 | 19 | | CONFIDENTIALITY ORDER entered by Magistrate Judge Eric I. Long on 5/22/17. See written Order. (TC, ilcd) (Entered: 05/22/2017) |
| 05/24/2017 | 20 | | CERTIFICATE OF SERVICE by Alejandra Aguero (Langacker, Ronald) (Entered: 05/24/2017) |
| 07/21/2017 | 21 | | CERTIFICATE OF SERVICE by Alejandra Aguero (Langacker, Ronald) (Entered: 07/21/2017) |
| 07/21/2017 | 22 | | CERTIFICATE of Service/Counsel *Defendants' Answer to Plaintiff's First Set of Interrogatories and Defendants' Response to Plaintiff's First Request to Produce* by William J Brinkmann on behalf of All Defendants (Brinkmann, William) (Entered: 07/21/2017) |
| 08/31/2017 | 23 | | CERTIFICATE OF SERVICE by Board of Trustees of University of Illinois, University of Illinois *Def's Supp Interrogatories to Plf* (Brinkmann, William) (Entered: 08/31/2017) |
| 09/29/2017 | 24 | | CERTIFICATE *of Service*. (Langacker, Ronald) (Entered: 09/29/2017) |
| 10/17/2017 | | | ORAL MOTION to extend expert discovery deadlines by Plaintiff Alejandra Aguero. (KE, ilcd) (Entered: 10/17/2017) |
| 10/17/2017 | | | Minute Entry for proceedings held 10/17/2017 before Magistrate Judge Eric I. Long. Appearance for the Plaintiff by Ronald Langacker. Appearance for the Defendants by William Brinkman, Kenneth Reifsteck and Philip Pence. Status conference held by telephone. Status of case discussed. Oral motion to extend expert discovery deadlines by Plaintiff; no objections. Oral motion GRANTED. Plaintiff`s Expert Disclosure due by 11/30/2017. Plaintiff's shall make experts available for deposition by 1/2/2018. Defendant`s Expert Disclosure due by 1/29/2018. Defendant's shall make experts available for deposition by 3/2/2018. Further Status Conference set for 1/22/2018 at 10:00 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR−B: 10:05 AM.) (KE, ilcd) (Entered: 10/17/2017) |
| 01/08/2018 | 25 | | CERTIFICATE OF SERVICE by Board of Trustees of University of Illinois, University of Illinois *Defendant's First Supplemental Discovery Responses* (Brinkmann, William) (Entered: 01/08/2018) |
| 01/22/2018 | | | Minute Entry for proceedings held 1/22/18 before Magistrate Judge Eric I. Long. Appearances on behalf of plaintiff by Ronald Langacker; for defendants by William Brinkmann and Philip Pence. Telephone Status Conference held. Status of discovery discussed. Status Conference set for 4/24/2018 at 10:45 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR−B 10:00 AM.) (SKR, ilcd) (Entered: 01/22/2018) |

| 01/22/2018 | 26 | | NOTICE to Take Deposition of Alejandra Aguero on February 8, 2018 (Brinkmann, William) (Entered: 01/22/2018) |
|---|---|---|---|
| 02/02/2018 | 27 | | NOTICE to Take Deposition of Alejandra Aguero on February 8, 2018 (Brinkmann, William) (Entered: 02/02/2018) |
| 02/28/2018 | 28 | | CERTIFICATE OF SERVICE by Board of Trustees of University of Illinois (Brinkmann, William) (Entered: 02/28/2018) |
| 03/21/2018 | 29 | | MOTION to Continue *Status Conference* by Plaintiff Alejandra Aguero. Responses due by 4/4/2018 (Langacker, Ronald) (Entered: 03/21/2018) |
| 03/23/2018 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 3/23/18. Plaintiff's Agreed Motion to Reschedule Status Conference 29 is GRANTED. The Status Conference scheduled for April 24, 2018 at 10:45 A.M. is RESCHEDULED to May 24, 2018, at 10:30 A.M. by telephone from Urbana (Court will place call) before Magistrate Judge Eric I. Long. (TC, ilcd) (Entered: 03/23/2018) |
| 04/02/2018 | 30 | | CERTIFICATE OF SERVICE by Alejandra Aguero (Langacker, Ronald) (Entered: 04/02/2018) |
| 04/19/2018 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 4/19/18. Due to a conflict in the Court's calendar, the Final Pretrial Conference set for 1/7/19 at 1:30 PM is RESET to 1/11/19 at 11:00 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. (TC, ilcd) (Entered: 04/19/2018) |
| 04/19/2018 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 4/19/18. Due to 1/21/19 being a Federal Holiday, the Courthouse will be closed. Therefore, the Jury Trial previously set to begin on 1/21/19 at 9:30 AM is RESET to begin 1/22/19 at 9:00 AM in Courtroom A in Urbana before Judge Colin Stirling Bruce. The Court is aware that counsel indicated this trial would take 5 days and will make accommodations in its schedule as necessary. (TC, ilcd) (Entered: 04/19/2018) |
| 05/24/2018 | | | Minute Entry for proceedings held 5/24/18 before Magistrate Judge Eric I. Long. Appearance on behalf of plaintiff by Ronald Langacker. Appearance on behalf of defendant by William Brinkmann. Telephone Status Conference held. Status of case discussed. Option for settlement offered. Status Conference set for 7/18/2018 at 11:00 AM by telephone from Urbana (court will place call) before Magistrate Judge Eric I. Long. (Tape #UR−B 10:33 AM.) (SKR, ilcd) (Entered: 05/24/2018) |
| 06/14/2018 | 31 | | MOTION to Withdraw as Attorney by Defendants Board of Trustees of University of Illinois, University of Illinois. Responses due by 6/28/2018 (Pence, Philip) (Entered: 06/14/2018) |
| 06/15/2018 | | | TEXT ORDER entered by Magistrate Judge Eric I. Long on 6/15/18. The Motion to Withdraw 31 is GRANTED. The Court directs the Clerk to remove attorney Philip J. Pence as counsel of record for Defendant. (TC, ilcd) (Entered: 06/15/2018) |
| 07/18/2018 | | | Oral MOTION to Extend Discovery Deadlines by Plaintiff Alejandra Aguero. Responses due by 8/1/2018 (KE, ilcd) (Entered: 07/18/2018) |
| 07/18/2018 | | | Minute Entry for proceedings held 7/18/2018 before Magistrate Judge Eric I. Long. Appearance for the Plaintiff by Ronald Langacker. Appearance for |

| | | | |
|---|---|---|---|
| | | | Defendant by William Brinkmann. Status conference held by telephone. Status of case discussed. Oral Motion to extend discovery deadlines by Plaintiff; no objection. Oral motion GRANTED. Discovery due by 8/31/2018. Motions due by 9/28/2018. (Tape #UR−B: 11:04 AM.) (KE, ilcd) (Entered: 07/18/2018) |
| 08/08/2018 | 32 | | NOTICE to Take Deposition of Renyolds on 8/14/18 by Plaintiff Alejandra Aguero.(Langacker, Ronald) (Entered: 08/08/2018) |
| 08/08/2018 | 33 | | NOTICE to Take Deposition of Mark Peecher on 8/14/2018 by Plaintiff Alejandra Aguero.(Langacker, Ronald) (Entered: 08/08/2018) |
| 08/14/2018 | 34 | | NOTICE to Take Deposition of Dr. Gretchen Winters on August 28, 2018 by Plaintiff Alejandra Aguero.(Langacker, Ronald) (Entered: 08/14/2018) |
| 08/14/2018 | 35 | | NOTICE to Take Deposition of Ms. Donna McNeely on August 28, 2018 by Plaintiff Alejandra Aguero.(Langacker, Ronald) (Entered: 08/14/2018) |
| 09/24/2018 | 36 | | NOTICE of Appearance of Attorney by Nathan T Kolb on behalf of Board of Trustees of University of Illinois (Kolb, Nathan) (Entered: 09/24/2018) |
| 09/27/2018 | 37 | | MOTION for Leave to File *Non−Conforming Document* by Defendant Board of Trustees of University of Illinois. Responses due by 10/11/2018 (Reifsteck, Kenneth) (Entered: 09/27/2018) |
| 09/28/2018 | 38 | | MOTION for Summary Judgment by Defendant Board of Trustees of University of Illinois. Responses due by 10/19/2018 (Attachments: # 1 Exhibit Elliott Declaration, # 2 Exhibit Aguero Dep. Part 1, # 3 Exhibit Aguero Dep. Part 2, # 4 Exhibit Aguero Dep. Part 3, # 5 Exhibit Winter Dep. Part 1, # 6 Exhibit Winter Dep. Part 2, # 7 Exhibit Duran Declaration, # 8 Exhibit Peecher Dep. Part 1, # 9 Exhibit Peecher Dep. Part 2, # 10 Exhibit Peecher Dep. Part 3, # 11 Exhibit Owens Declaration, # 12 Exhibit Young Declaration, # 13 Exhibit McNeely Dep., # 14 Exhibit Plaintiff's Answers to 3d Interrogs)(Reifsteck, Kenneth) (Entered: 09/28/2018) |
| 10/01/2018 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 10/1/18. Defendants' Motion to File Non−Conforming Document 37 is GRANTED. (TC, ilcd) (Entered: 10/01/2018) |
| 10/04/2018 | 39 | | MOTION to Amend/Correct 38 MOTION for Summary Judgment by Defendant Board of Trustees of University of Illinois. Responses due by 10/18/2018 (Reifsteck, Kenneth) (Entered: 10/04/2018) |
| 10/08/2018 | 40 | | MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment* by Plaintiff Alejandra Aguero. Responses due by 10/22/2018 (Langacker, Ronald) (Entered: 10/08/2018) |
| 10/09/2018 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 10/9/18. Defendant's Motion to Amend/Correct Motion for Summary Judgment 39 is GRANTED. Plaintiff's Motion for Extension of Time to File Response 40 is GRANTED. Plaintiff's Response is now due October 26, 2018. Defendant's Reply is due November 9, 2018. (TC, ilcd) (Entered: 10/09/2018) |
| 10/26/2018 | 41 | | RESPONSE to Motion re 38 MOTION for Summary Judgment filed by Plaintiff Alejandra Aguero. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Langacker, Ronald) (Entered: 10/26/2018) |

| 11/06/2018 | 42 | | MOTION for Leave to File *Non−Conforming Document* by Defendant Board of Trustees of University of Illinois. Responses due by 11/20/2018 (Reifsteck, Kenneth) (Entered: 11/06/2018) |
|---|---|---|---|
| 11/06/2018 | | | TEXT ORDER entered by Judge Colin Stirling Bruce on 11/6/18. Defendant's Motion to File Non−Conforming Document 42 is GRANTED. (TC, ilcd) (Entered: 11/06/2018) |
| 11/07/2018 | 43 | | REPLY to Response to Motion re 38 MOTION for Summary Judgment filed by Defendant Board of Trustees of University of Illinois. (Reifsteck, Kenneth) (Entered: 11/07/2018) |
| 11/16/2018 | 44 | | ORDER entered by Judge Colin Stirling Bruce on 11/16/18. This matter was previously scheduled for a final pretrial conference by personal appearance on 1/11/19 at 11:00 AM, Courtroom A, US Courthouse, Urbana, Illinois, before Judge Colin S. Bruce; and jury selection/jury trial by personal appearance on 1/22/19 at 9:00 AM, Courtroom A, US Courthouse, Urbana, Illinois, before Judge Colin S. Bruce. Pretrial motions due by 12/14/18; responses thereto by 12/28/18. Objections to jury instructions or proposed voir dire due by 1/16/19. See written Order. (TC, ilcd) (Entered: 11/16/2018) |
| 12/14/2018 | 45 | | MOTION in Limine by Defendant Board of Trustees of University of Illinois. Responses due by 12/28/2018 (Brinkmann, William) (Entered: 12/14/2018) |
| 12/14/2018 | 46 | | MOTION in Limine by Plaintiff Alejandra Aguero. Responses due by 12/28/2018 (Langacker, Ronald) (Entered: 12/14/2018) |
| 12/17/2018 | 47 | 14 | ORDER entered by Judge Colin Stirling Bruce on 12/17/18. Defendant's Motion for Summary Judgment 38 is GRANTED in full. Judgment is entered in favor of Defendant and against Plaintiff. The final pretrial and jury trial dates are hereby VACATED. The pending Motions in Limine 45 , 46 are MOOT. This case is terminated. See written Order. (KM, ilcd) (Entered: 12/17/2018) |
| 12/17/2018 | 48 | 66 | JUDGMENT entered. (KM, ilcd) (Entered: 12/17/2018) |
| 12/27/2018 | 49 | | MOTION for Bill of Costs by Defendant Board of Trustees of University of Illinois. Responses due by 1/10/2019 (Reifsteck, Kenneth) (Entered: 12/27/2018) |
| 12/28/2018 | | | NOTICE re 49 Bill of Costs : Costs will be taxed in the amount of $1,411.20; parties have 14 days to file objections. (TC, ilcd) Modified on 1/3/19 to remove "Motion" from title (TC, ilcd). (Entered: 12/28/2018) |
| 01/10/2019 | 50 | 9 | NOTICE OF APPEAL by Alejandra Aguero. Filing fee $ 505, receipt number 0753−3010045. (Goldman, Jonathan) (Entered: 01/10/2019) |
| 01/10/2019 | 51 | 11 | JURISDICTIONAL STATEMENT by Alejandra Aguero re 50 Notice of Appeal (Goldman, Jonathan) (Entered: 01/10/2019) |

E-FILED
Thursday, 10 January, 2019  02:56:17 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| ALEJANDRA AGÜERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 16-cv-2298 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Judge Colin S. Bruce |
| UNIVERSITY OF ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

**NOTICE** is hereby given that ALEJANDRA AGÜERO, Plaintiff in the above named case,

hereby appeals to the United Stated Court of Appeals for the Seventh Circuit from the final judgment

and order granting the Defendant's Motion for Summary Judgment entered in this action on

December 17, 2018.

Date: January 10, 2019              /s/ Jonathan C. Goldman
                                   Jonathan C. Goldman of the Law Offices of
                                   Goldman & Ehrlich, Chtd. As attorneys for
                                   Plaintiff ALEJANDRA AGÜERO

Jonathan C. Goldman
Law Offices of Goldman & Ehrlich, Chtd.
20 S. Clark Street, Suite 500
Chicago, IL 60603
(312) 332-6733
jon@goldmanehrlich.com
ARDC # 06210828

9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **ALEJANDRA AGÜERO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.: 16-cv-2298** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | **Judge Colin S. Bruce** |
| **UNIVERSITY OF ILLINOIS** | ) | |
| | ) | |
| **Defendant.** | ) | |

## NOTICE OF FILING

**TO:**  William Brinkmann
Kenneth D. Reifsteck
Philip J. Pence
Thomas, Mamer & Haughey, LLP
30 E. Main
P.O. Box 560
Champaign, IL 61824-0560

**PLEASE TAKE NOTICE** that on January 10, 2019, the undersigned did file **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION** in the United States District Court for the Central District of Illinois, Urbana Division, a copy of which is herewith served upon you.

 /s/ Jonathan C. Goldman
Jonathan C. Goldman of the Law Offices of Goldman & Ehrlich, Chtd. As attorneys for Plaintiff ALEJANDRA AGÜERO

## PROOF OF SERVICE

I, Shanita S. Stevens, an non-attorney on oath, state that I served this notice by mailing a copy to WILLIAM BRINKMANN, KENNETH D. REIFSTECK, and PHILIP J. PENCE at the above address and depositing same in the U.S. mail at 20 South Clark Street, Chicago, Illinois 60603, at or about 5:00 p.m., January 10, 2019 with proper postage prepaid.

 /s/ Shanita S. Stevens

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# URBANA DIVISION

| | | |
|---|---|---|
| ALEJANDRA AGÜERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 16-cv-2298 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Judge Colin S. Bruce |
| UNIVERSITY OF ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

## APPELLANT'S JURISDICTIONAL STATEMENT

**NOW COMES** Plaintiff, ALEJANDRA AGÜERO, by and through her attorney Jonathan C. Goldman of the Law Offices of Goldman & Ehrlich, Chtd., and as her Jurisdictional Statement, states as follows:

This action is brought to remedy unlawful discrimination practices on the basis of Race, National Origin, and Gender under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq; State Officials and Employees Ethics Act (5 ILCS 430/15-5 *et. seq*.); and the Illinois Whistleblower Act, 740 ILCS 174/1 *et. seq*.

The Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. § 1367 for Plaintiff's state law causes of action.  Jurisdiction was not disputed.  The District court granted Defendant's motion to dismiss on the state law claims on March 30, 2017 and granted the Defendant's Rule 56 motion for summary judgment on the remaining issues on December 17, 2018.

The jurisdiction of the Circuit Court of Appeals is based on 28 U.S.C. §1291.

Jurisdiction is not disputed.

Date: January 10, 2019                             /s/ Jonathan C. Goldman
                                               Jonathan C. Goldman of the Law Offices of
                                               Goldman & Ehrlich, Chtd. As attorneys for
                                               Plaintiff ALEJANDRA AGÜERO

Jonathan C. Goldman
Law Offices of Goldman & Ehrlich, Chtd.
20 S. Clark Street, Suite 500
Chicago, IL 60603
(312) 332-6733
**jon@goldmanehrlich.com**
ARDC # 06210828

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| ALEJANDRA AGÜERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 16-cv-2298 |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Judge Colin S. Bruce |
| UNIVERSITY OF ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF FILING

TO:  William Brinkmann
Kenneth D. Reifsteck
Philip J. Pence
Thomas, Mamer & Haughey, LLP
30 E. Main
P.O. Box 560
Champaign, IL 61824-0560

**PLEASE TAKE NOTICE** that on January 10, 2019, the undersigned did file the **APPELLANT'S JURISDICTIONAL STATEMENT** in the United States District Court for the Central District of Illinois, Urbana Division, a copy of which is herewith served upon you.

/s/ Jonathan C. Goldman
Jonathan C. Goldman of the Law Offices of Goldman & Ehrlich, Chtd. As attorneys for Plaintiff ALEJANDRA AGÜERO

### PROOF OF SERVICE

I, Shanita S. Stevens, an non-attorney on oath, state that I served this notice by mailing a copy to WILLIAM BRINKMANN, KENNETH D. REIFSTECK, and PHILIP J. PENCE at the above address and depositing same in the U.S. mail at 20 South Clark Street, Chicago, Illinois 60603, at or about 5:00 p.m., January 10, 2019 with proper postage prepaid.

/s/ Shanita S. Stevens

3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **ALEJANDRA AGUERO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 16-CV-2298** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Plaintiff, Alejandra Aguero, filed her Amended Complaint (#8) against

Defendant, University of Illinois Board of Trustees, on January 30, 2017, alleging that

Defendant discriminated and retaliated against her on the basis of her race, national

origin, and gender in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §

2000e et seq.). Defendant filed a Motion for Summary Judgment (#38) on September 28,

2018, to which Plaintiff filed her Response (#41) on October 26, 2018. Defendant filed its

Reply (#43) on November 7, 2018. For the following reasons, Defendant's Motion for

Summary Judgment (#38) is GRANTED in full.

# BACKGROUND[1]

Plaintiff Alejandra Aguero

Plaintiff, Alejandra Aguero, is a Hispanic/Latino woman from Mexico, and thus is a member of three protected classes under Title VII of the Civil Rights Act of 1964: race, national origin, and gender.

Plaintiff started her career working for the University of Illinois in 2001. In 2005 she moved over to the Admissions department at the College of Business. During Plaintiff's employment with the University from 2001 through 2008, she received outstanding performance evaluations, accolades, and praise from her supervisor, Sandy Frank. During this time period, the University also paid for Plaintiff to pursue a

---

[1]The background facts are taken from Defendant's Undisputed Statement of Material Facts in Defendant's motion, Plaintiff's Additional Facts in her Response, and the exhibits attached by the parties to their filings.

Two of Plaintiff's Additional Facts, numbers 5 and 7, were objected to by Defendant because they only cite to Plaintiff's Amended Complaint for support, rather than to evidence in the record (such as deposition testimony or affidavits/declarations). Additional facts must be supported by evidentiary documentation referenced by specific page. Central District of Illinois Local Rule 7.1(D)(2)(b)(5); *Kibler v. United States*, 46 F.Supp.3d 844, 847 (C.D. Ill. 2014). The court will not go searching through the record to find facts to match up with the assertions in the Amended Complaint. See *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record").

Other of Plaintiff's (and Defendant's) material facts cite only to the Amended Complaint, but were not objected to that ground. Therefore, those unobjected-to facts, even though based on the Amended Complaint without citation to evidence in the record, will be deemed admitted.

master's degree in the area of admissions. Before Frank's retirement in 2008, Frank had initiated substantial bureaucratic process to have Plaintiff promoted to Assistant Director of the College of Business.

In 2008, Arlene Susan Elliott became Plaintiff's supervisor. From August 2011 until her retirement in January 2018, Elliott was the Associate Dean of Administration at the University of Illinois College of Business. In this position, Elliott was in charge of human resources, financial budgets, and facilities. Plaintiff reported directly to Elliott between 2008 and 2014 until her position at Admissions at the College of Business was eliminated. Plaintiff's duties in the Admissions office were to process application documents, to check for completeness and accuracy, and to deliver documents to the Graduate College at the University of Illinois. Plaintiff had no duty or authority to make decisions with respect to whether an applicant was approved for admission; however she could decide to recommend applicants for admission based on the accuracy and validity of the applicant's submitted application information. The departments determined who they wanted to admit, and the Graduate College made the final decision regarding admitting or denying an applicant. Plaintiff's office was in Room 315 of Wohlers Hall.

In 2014, Plaintiff's position in Admissions was decentralized. Plaintiff's position had been created to help process graduate admissions when the University still used a paper application system. Between 2008 and 2014, the Graduate College at the University moved to a more efficient and faster method for processing applications by

changing from a paper system to an electronic system. In 2014, the College of Business

was the only college processing paper applications. This was causing inefficiencies for

the Graduate College to have the College of Business using a different process than the

other colleges on campus. In May 2014, the Graduate College requested that the College

of Business use the same process for admissions that all other colleges were using

campus-wide. This change eliminated the need for Plaintiff's position. Per Plaintiff, she

was not involved in the decentralization process and does not know the details of why

her position was eliminated.

     Incident With Dr. Mahoney

     Plaintiff was not given a notification of non-reappointment when her Admissions

position was decentralized. Instead, she was given a temporary position in May 2014

working in the Office of Alumni Affairs at the College of Business. That office was

located on the fourth floor of Wohlers Hall, but Plaintiff's office remained in Room 315.

     In August 2014, Dr. Joseph Mahoney invited Plaintiff to lunch and she accepted.

During lunch, Mahoney discussed his marital problems and told Plaintiff that he

wanted to start a romantic relationship with her. Later that same month, or in

September 2014, Mahoney entered Plaintiff's office and asked if she would go to lunch

with him again. Plaintiff declined. The lunch and Mahoney's follow-up contact took

place over approximately a two-week span.

     On October 3, 2014, Plaintiff anonymously reported Mahoney's behavior to the

Office of Diversity, Equity, and Access (ODEA). Around the same time, she told her

supervisor, Gretchen Winter, about Mahoney's behavior. Winter conferred with Plaintiff's other supervisor, Mark Peecher, and then reported the conduct to the Dean of the College of Business and also to ODEA.

Jennie Marie Duran currently works as an investigator at the ODEA. In 2014-2015, she was the assistant director for the ODEA. Her job duties included investigation of complaints of discrimination and harassment. In October 2014, an unnamed complainant filed a complaint with the ODEA, alleging that Mahoney, a professor in the Department of Business Administration, had made unwanted sexual advances towards her. Duran met with Mahoney in response to the complaint, and he acknowledged that his actions were inappropriate and expressed regret for his conduct. In response to the complaint, the matter was resolved by informal resolution. The matter was determined to be resolved and no further complaints against Mahoney by the unnamed complainant were received. After the reports to the ODEA, Mahoney did not have any further inappropriate contact with Plaintiff. However, Plaintiff testified at her deposition that after reporting the incident with Mahoney she "continued to be harassed" by Elliott and Winter.

<u>Plaintiff's New Position and the Conference Board Account</u>

On October 1, 2014 (two days before she reported the Mahoney incident to the ODEA), Plaintiff became the Assistant Director of the Center for Professional Responsibility in Business and Society (CPRBS). Winter and Peecher were Plaintiff's supervisors at CPRBS. As a human resources administrator for the College of Business,

5

Elliott continued to have responsibilities with Plaintiff's employment after Plaintiff started work at CPRBS. These responsibilities included consultations with her supervisors, Winter and Peecher, with respect to job performance and performance evaluations. In her new position, Plaintiff's office remained at 315 Wohlers Hall.

The job description presented to Plaintiff at the beginning of her employment did not accurately reflect what her actual job duties were during the course of her employment because, according to Peecher, her superiors quickly learned that Plaintiff could not perform those duties satisfactorily. One of Plaintiff's new responsibilities was to process reimbursements for CPRBS accounts. Shortly after starting work for CPRBS, Plaintiff requested assistance from Roger Owens, an accountant for the College of Business Administration Services, because she did not have an accounting background. Owens provided such assistance to CPRBS from 2013-2016. Owens helped Plaintiff over a period of several months in the fall of 2014 to set up spreadsheets to keep track of income and expenses for accounts within CPRBS. He provided Plaintiff with advice, upon request, as to how charges were processed and posted to the various accounts. Owens assisted her with preparation of monthly statements. Plaintiff consulted Owens on an "as needed" basis.

During the summer of 2015, Winter and Peecher asked Plaintiff to prepare a report of all gifts received by CPRBS. One of the accounts for which Plaintiff had responsibility was the "Conference Board Account" (CBA). An entity known as the Conference Board paid funds to the University for services performed by CPRBS. The

6

proper handling of accounting methods for the CBA within the CPRBS was one of Plaintiff's job duties, delegated to Plaintiff by Winter. Owens worked with the campus accounting division to set up the account used to receive these funds at the CPRBS and for charges against that account. An issue arose as to whether the CBA was considered a "gift fund" and whether it should be included in the report. Specifically, the question regarding the CBA was whether it should be categorized as a "gift account" or a "fee/income account." At that time, Plaintiff expressed confusion regarding how to properly categorize an account for expenses to this fund, relating in part to whether the CBA was a gift account. Plaintiff contended that Winter said the CBA was a gift fund, and Plaintiff subsequently inquired as to whether this designation was appropriate.

<u>The September 4, 2015 CBA Meeting</u>

On September 4, 2015, Jay Young, an administrative associate from the College of Business office, requested a meeting with Winter and Plaintiff to discuss the CBA. Young worked with Plaintiff from 2014-2015 to assist her with answering questions regarding expense reports and how to handle transactions. He assisted her on an "as-needed" basis continuously while she was employed at CPRBS. A meeting was held on September 4, 2015 (or shortly after), which was primarily focused on the accounting related to the CBA. The meeting was attended by Plaintiff, Young, Winter, and Owens. At the meeting, the parties present discussed and answered questions regarding proper handling procedures for funds being paid by the Conference Board and also for contracts between the Conference Board and the University.

7

Young, in his declaration to this court attached to Defendant's motion, stated that "[a]ll of the funds from the [CBA] were accounted for and there was no finding or issue regarding dishonesty or deception." Young clarified where the money was to be handled, procedurally, and clarified what expenses could be charged to the fund. Subsequent to that meeting, there were no further questions regarding proper accounting procedures for the CBA that arose, to Young's knowledge.

Owens, in his declaration, recalled that, around August-September 2015, Plaintiff had questions that she expressed to him and Young regarding how to handle the CBA charges and whether that account was a gift account or a fee/income account. In order to respond to those questions, Owens attended the aforementioned meeting. During the meeting, the proper accounting methods for managing the CBA were discussed. Expenses which had been misclassified were to be corrected. Young explained that this account was not a gift account, but was a fee/income account. Although the nature of the account and how to charge expenses were the subject of the questions, there was never any deception or improper use of the funds discovered, per Owens' declaration.

After the September 4 meeting, which attempted to clarify the CBA matter, it was determined that the funds in the CBA would be used to help support Winter's salary. During the meeting, Winter confirmed that she had been signing contracts on behalf of the University at $3,000 per year fifteen times throughout the year.

<u>Plaintiff's Reports to the University Office of Ethics and Compliance and ODEA</u>

Approximately ten days later, on September 14, 2015, Plaintiff contacted the University Office of Ethics and Compliance (OEC) by email regarding the CBA. She was concerned that one of the College of Business accounts was possibly not being used correctly. Plaintiff was asking for advice because she did not want to be held accountable for handling Winter's CBA travel vouchers.

On September 16, 2015, Donna McNeely, executive director of the OEC, responded by email to Plaintiff, stating that she would investigate the use of the CBA. Elliott was contacted by McNeely during the latter part of September 2015 regarding a complaint to the OEC concerning the proper accounting methods for the handling of funds paid to the University by an entity known as the Conference Board. McNeely did not disclose the name of the complainant.

On September 23, 2015, McNeely spoke with Young, Owens, and Elliott on a conference call about the CBA. McNeely asked about the CBA and whether it was being used appropriately. McNeely was informed, during the conference call, about the September 4, 2015 meeting, and that the accounting procedures were explained and corrected. In the months previous to August 2015, Owens tried to explain to Plaintiff the basic differences between gift accounts and fee/income accounts. Plaintiff's questions in August-September 2015 regarding the CBA related to matters that Owens had already explained to her. During this conversation, McNeely concluded, in her opinion, that Plaintiff should have recognized the CBA issue on her own. Also during this conversation, there was discussion about how the CBA was being used and how those

9

concerns had been raised. There was discussion about Plaintiff, specifically regarding Plaintiff's performance at her position, and the belief that Plaintiff was not meeting the expectations of her employment. Additionally, there was discussion about the fact that Plaintiff's personnel evaluation was about to occur, which could result in serious personnel action.

In consultation with Young, McNeely was provided information regarding accounting for receipt of funds and expenses charged against the CBA. Thereafter, Elliott did not further communicate with McNeely regarding this complaint. Elliott did not communicate with Winter or Peecher, at any time, regarding the contact by McNeely from the OEC or the complaint referenced by her. In late 2015, based on an email from Plaintiff indicating that she believed Winter and Peecher knew about her OEC complaint, McNeely had a follow-up conversation with Elliott, and inquired whether or not Elliott had shared their conversation about the OEC complaint with Winter or Peecher. Elliott indicated that she had not shared it.

McNeely did not learn anything from her conversations with Young, Elliott, and Owens that indicated that Plaintiff had reported potential wrongdoing so as to make her report protected activity under the state officials and employees whistleblower provisions.

McNeely did not share Plaintiff's identity with anyone, and did not disclose the name of any person making a complaint to her office. Young did not communicate with Winter, Peecher, or Plaintiff regarding the inquiry by McNeely. Winter and Peecher

10

both testified that they first learned of the OEC investigation and report after Plaintiff filed this lawsuit.

Plaintiff was scheduled to receive her first annual performance evaluation within one year of beginning her position at CPRBS- thus, before October 1, 2015. Elliott consulted with Winter and Peecher regarding their preparation of a performance evaluation of Plaintiff during the June-September 2015 time period, and Elliott was advised before September 2015 that Plaintiff's job performance was unsatisfactory.

On September 24, 2015 (the day after the conference call between McNeely, Elliott, Owen, and Young), Winter and Peecher completed Plaintiff's performance evaluation. Plaintiff's performance was "Not Acceptable" or "Needs Improvement/Not Acceptable" in all categories, with examples provided of Plaintiff's deficiencies. The evaluation also questioned Plaintiff's judgment and her knowledge of her position. Plaintiff was given three months to improve her performance. Plaintiff drafted a detailed response to the evaluation and presented it to Winter and Peecher.

The following day, on September 25, 2015, Plaintiff contacted McNeely at the OEC and stated that she was being harassed as a result of her September 14, 2015 ethics inquiry regarding the handling of the CBA. On September 26, 2015, McNeely responded and confirmed that she had contacted the College of Business to investigate the complaint, and informed Plaintiff that if she felt she was being harassed, she should contact the ODEA.

11

Three weeks later, on October 12, 2015, Plaintiff came in to the ODEA without an appointment. She verbally complained to Jennie Marie Duran of discrimination based on race, marital status (single parent), and age. Plaintiff told Duran that she had received a notice from her supervisor, Winter, that she needed to improve her performance or her contract would be revisited in three months' time. Duran's notes from the meeting state that "After asking [Plaintiff] to explain the connection of a protected class to her concern, [Plaintiff] later stated that she did not feel it was due to a protected class as much as it was due to the stress on the supervisor of the investigation by ethics and a personality conflict the two of them have."

Plaintiff disputes this assertion, testifying that, rather, Duran was the one who believed that Plaintiff was not in a protected class. Plaintiff told Duran that she felt discriminated against based upon race because in the past other individuals not in the same protected class as her that had "concerns" were dealt with more favorably.

During this visit, Plaintiff stated that her supervisor, Winter, was under an ethics investigation and was channeling her anger for the investigation towards Plaintiff. Plaintiff stated that she felt this was a hostile work environment but, after further assessment, it was more bullying she was describing, and she stated she did not think it was attributed necessarily to a protected group.

Plaintiff, again, disputes this assertion, testifying that it was Duran who made the assertion that no discrimination was involved. Duran referred Plaintiff to Academic Human Resources to tell them of her concern regarding a whistleblowing effect related

to the ethics investigation and her current evaluation. Additionally, Duran referred Plaintiff to the University Ethics Office to discuss her concerns regarding stress in working with them on an investigation involving her supervisor.

Almost two months later, in December 2015 Winter entered Plaintiff's office and asked Plaintiff what she was doing and why Plaintiff had done the things she had done, apparently alluding to the OEC and ODEA complaints. Winter stated that she did not care what the state had to say, as private funds paid her salary and not the state. Winter told Plaintiff that she had never met anyone like her, and stormed out of Plaintiff's office.

On December 22, 2015, three months after Plaintiff's evaluation in which she was given three months to improve, Winter and Peecher conducted a second performance evaluation, again finding that Plaintiff's performance was "Not Acceptable" in every measurable category. They provided Plaintiff specific examples of unsatisfactory performance in the evaluation. Plaintiff "believed" she had requested a follow-up meeting with Winter and Peecher by email, but that they did not respond. Elliott was aware in December 2015 and March 2016 that Plaintiff had been given follow-up performance evaluations indicating that her performance was not acceptable within the CPRBS. Plaintiff drafted a detailed response to her December evaluation and presented it to Winter and Peecher. No reply to Plaintiff's detailed response was ever received, although Peecher stated that he did speak to Plaintiff again about her performance.

On December 22, 2015, that same day, Plaintiff again contacted ODEA. On January 8, 2016, Plaintiff came in to Duran's office for a follow-up. According to Duran, Plaintiff stated that she did not feel that she was being discriminated against based on a protected category, but rather that she was being bullied due to an ethics issue.

Plaintiff again disputes this statement, claiming Duran herself made the assertion. Duran explained to Plaintiff that this was out of her jurisdiction, and that Plaintiff could discuss her concerns with the new ODEA director. Duran then closed the case.

<u>Plaintiff's Termination</u>

Over three months after Plaintiff's second performance evaluation, on April 7, 2016, Plaintiff was notified that due to her failure to meet her employer's performance expectations, the University would be terminating her contract. Elliott was aware in April 2016 that a request by the CPRBS, to the campus human resources office, for the Board of Trustees to issue a notice of non-reappointment had been approved and communicated to Plaintiff. Thereafter, Elliott arranged a temporary assignment for Plaintiff, to the end of her contract term, with the College of Education. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and Illinois Department of Human Rights (IDHR) on September 12, 2016. The EEOC issued Plaintiff a right to sue letter on January 12, 2017.

<u>Procedural History</u>

14

Plaintiff filed her Amended Complaint (#8) on January 30, 2017, alleging racial discrimination under Title VII (Count I), national origin discrimination under Title VII (Count II), gender discrimination under Title VII (Count III), retaliation under Title VII (Count IV), and violations of the Illinois State Officials and Employees Ethics Act (Count V) and Illinois Whistleblower Act (Count VI). On March 30, 2017, this court entered an Order (#13) granting in part and denying in part Defendant's Motion to Dismiss (#9). The Illinois state claims were dismissed, but the motion was denied with respect to Plaintiff's federal Title VII claims. Those claims remain pending and are at issue in Defendants' instant Motion for Summary Judgment (#38).

## ANALYSIS

Defendant argues that summary judgment should be granted in its favor because the evidence adduced in discovery does not support Plaintiff's claims under Title VII. Defendant also argues that Plaintiff's gender discrimination claim is time barred.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of

that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Counts I & II- Racial and National Origin Discrimination*

Defendant first contends that Plaintiff has not demonstrated the existence of a genuine issue of material fact with respect to her racial/national origin discrimination

claim. Defendant argues that no facts support her claim of discrimination, whether

analyzed under the direct or indirect methods for proving such discrimination.

The Seventh Circuit has recently stated, in regard to evaluating discrimination

claims under Title VII:

> Title VII prohibits an employer from discharging an employee
> because of that person's race. See 42 U.S.C. § 2000e–2(a)(1). A plaintiff may
> prove race discrimination either directly or indirectly, and with a
> combination of direct and circumstantial evidence. The direct method
> requires the plaintiff to set forth "sufficient evidence, either direct or
> circumstantial, that the employer's discriminatory animus motivated an
> adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th
> Cir. 2012). The indirect method allows a plaintiff to prove discrimination
> by using the burden-shifting approach articulated in *McDonnell Douglas
> Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See
> *Coleman*, 667 F.3d at 845.
>
> In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016),
> we clarified that the "direct" and "indirect" methods are not subject to
> different legal standards. Courts should not sort evidence of
> discrimination "into different piles, labeled 'direct' and 'indirect,' that are
> evaluated differently." *Id*. at 766. Instead, there is a single inquiry: it is
> "simply whether the evidence would permit a reasonable factfinder to
> conclude that the plaintiff's race ... caused the discharge." *Id*. at 765. Our
> decision in Ortiz did not alter "*McDonnell Douglas* or any other
> burden-shifting framework, no matter what it is called as a shorthand." *Id*.
> at 766.
>
> The *McDonnell Douglas* burden-shifting framework is designed to
> "sharpen the inquiry into the elusive factual question of intentional
> discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S.
> 248, 255 n.8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff carries the
> initial burden of establishing a *prima facie* case of discrimination, which
> can be accomplished by setting forth evidence that: "(1) she is a member
> of a protected class, (2) her job performance met [the employer's]
> legitimate expectations, (3) she suffered an adverse employment action,
> and (4) another similarly situated individual who was not in the protected
> class was treated more favorably than the plaintiff." *Burks v. Wisconsin
> Dep't of Transportation*, 464 F.3d 744, 750–51 (7th Cir. 2006) (citation
> omitted). Once established, this *prima facie* case creates a presumption of
> discrimination, and the "burden then must shift to the employer to

articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Coleman*, 667 F.3d at 845, quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

*McKinney v. Office of Sheriff of Whitely County*, 866 F.3d 803, 807 (7th Cir. 2017).

<u>Suspicious Timing</u>

Plaintiff first attempts to argue in her Response that "the circumstantial evidence in this matter, taken as a whole, draws an inference that [Plaintiff] was intentionally discriminated against by the University." Plaintiff then states "[w]hile there is a plethora of evidence to support this claim, the suspicious timing involved is perhaps the most apparent." Plaintiff cites to the fact that she received her bad evaluation (on September 24, 2015) just ten days after her complaint to the OEC (September 14, 2015), and that she was terminated in April 2016 within months of her fall 2015 OEC and ODEA complaints.

The Seventh Circuit has recognized "three types of 'circumstantial' evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

18

*Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007).

Suspicious timing alone rarely is sufficient to create a triable issue and, moreover, it is

clear that mere temporal proximity is not enough to establish a genuine issue of

material fact. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006).

While the Seventh Circuit in *Sun* held that suspicious timing can be

circumstantial evidence of discrimination, such timing in that case related to an adverse

employment action following close on the heels of *a discrete discriminatory act*, such as a

comment or perceived discriminatory action made toward a plaintiff. *Sun*, 473 F.3d at

813. However, here Plaintiff is describing an adverse employment action quickly

following her engaging in a *protected activity*, *i.e.* complaining about discrimination to an

investigatory body. Such evidence is much more appropriately presented in the context

of a *retaliation* claim. *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)

(Title VII prohibits employers from retaliating against employees who *engage in activity*

*protected* by the statute. 42 U.S.C. § 2000e–3(a)) (emphasis added); *Thompson v. North*

*American Stainless, LP*, 562 U.S. 170, 174 (2011) ("Title VII's antiretaliation provision

prohibits an employer from discriminat[ing] against any of his employees for *engaging*

*in protected conduct*...") (emphasis added, internal quotations omitted). The evidence

(and argument) presented by Plaintiff does not demonstrate that the adverse

employment action came immediately after some sort of discriminatory act aimed at

Plaintiff, and, thus, this may be evidence germane to a retaliation claim, but not a

discrimination claim.

McDonnell Douglas Burden Shifting

The only other actual, specific evidence cited by Plaintiff in her Response is that three similarly situated employees who were outside the protected class, but had also raised "concerns," were treated more favorably.  The "similarly situated employees" argument is analyzed under the *McDonnell Douglas* framework, which, as noted above, is still employed by the Seventh Circuit in analyzing Title VII discrimination claims. *McKinney*, 866 F.3d at 807. It is undisputed that Plaintiff is a member of a protected class and suffered an adverse employment action, therefore the court will focus on the other two elements of the *McDonnell Douglas* framework: whether Plaintiff was meeting her employer's legitimate expectations, and whether there existed similarly situated individuals who were not in the protected class and were treated more favorably than Plaintiff. *McKinney*, 866 F.3d at 807.

1.      Legitimate Expectations

Defendant argues that the evidence shows Plaintiff was not meeting her employer's legitimate expectations. In support, Defendant cites to the poor performance evaluations conducted by her supervisors, Peecher and Winter. The evaluations provided examples of Plaintiff's deficiencies in the areas of "knowledge, judgment, productivity, professional relationships, organization, reliability, and supervision." In the knowledge section, Defendant notes Plaintiff was not sufficiently knowledgeable of the department's website, failed to access information from the website when asked for information that could easily be found there, failed to complete financial reviews on a

20

regular monthly basis, and did not seem to fully understand or be able to explain the material in those reports. Defendant cites an example of one instance where Plaintiff, with assistance, prepared a notebook of reports with only a partial year's worth of reports and included a closed account no longer in use.

For deficiencies in the "judgment" portion, Defendant cites to Plaintiff's hesitation to take responsibility when asked to manage creatively, complaining that insufficient direction was the reason something did not work. Defendant also notes Plaintiff's failure to learn sufficiently from past work, that Plaintiff rarely read emails if they contained multiple requests, and that Plaintiff only completed some items requested and ignored others. Plaintiff also showed an inability to multitask and inability to work independently or follow-up on projects unless more senior personnel followed up with her, leaving many projects undone. Defendant also noted that Plaintiff had problems with productivity due to her failure to meet deadlines. For example, Plaintiff failed to connect with two doctoral students about CPRBS, in that she was unable to provide a short writeup about their projects. Defendant also cited to an example where Plaintiff was asked to rewrite a Facebook post advertising a competition. Plaintiff's original post was lengthy, contained errors, and was largely unhelpful. Instead of rewriting the post, Plaintiff sent an unresponsive and combative email. The post was changed several days later. Plaintiff also required significant help in doing her job, often requiring "step-by-step instructions."

For the professional relationships deficiencies, Defendant admits that Plaintiff made a good initial professional impression, but states that she did not do well when dealing with "important third-party stakeholders," for example citing the fact that others had a difficult time working with Plaintiff during a competition in spring 2015 because she overlooked ways to be hospitable to guests, leading an outside visitor to say she would prefer not to work with Plaintiff because Plaintiff did not understand the timeline of the event.

Regarding Plaintiff's deficiencies in organization, a visitor once commented that Plaintiff seemed unable to multitask, and that, after "learning her job from two individuals who had successfully managed a project, [Plaintiff] took few notes and did not implement or follow-up on what she had learned." Additionally, Plaintiff failed to prioritize, plan, and understand the timeline for an event. This failure resulted in Plaintiff being unprepared for the arrival of external guests and project sponsors, creating embarrassment for CPRBS. In terms of reliability, Plaintiff rarely met deadlines without sacrificing accuracy, quality, or service recipient satisfaction, and she did not report unavoidable delays in advance of agreed-upon deadlines, or deadlines she suggested. Instead of taking on difficult or inconvenient responsibilities, Plaintiff suggested that some tasks were too time-consuming, and that she should not have them anymore. For example, Plaintiff asked for the responsibility to supervise a part-time student assigned to help manage and maintain CPRBS' social media presence, only to later ask to be relieved of that task because she found it too time-consuming.

For deficiencies in supervision, two individuals Plaintiff regularly worked with in her job did not trust her to complete a majority of her assigned tasks accurately, completely, or in a timely manner. They found working with Plaintiff to require intense supervision and oversight, making it easier to simply not delegate projects to her. Plaintiff had been supervising two students on social media matters, and failed to give them any direction or assignments while she went on vacation or was absent. Plaintiff also failed to make arrangements for the students to complete time cards so they could be paid.

At the September 2015 performance evaluation, Plaintiff was given three months to improve her performance. Following the three month period, Plaintiff was re-evaluated by Peecher and Winter on December 22, 2015. Her performance remained "Not Acceptable" in every measurable category.

Plaintiff, in response, argues that the complaints by Peecher and Winter about her performance were entirely subjective, and placed her in a position where she would be unable to successfully perform her job duties at all. Plaintiff points to her responses to the evaluations, and notes that Peecher, in his deposition, admitted that Plaintiff's initial job description did not accurately reflect what Plaintiff's actual duties were during the time period she worked for him. In her response, under the knowledge section, Plaintiff stated that she acquired knowledge of the various software and systems used by CPRBS, stating that she worked with other individuals to fix broken website links. In regard to the notebook containing only partial financial reports,

23

Plaintiff admitted it contained an account no longer in use and this had caused

confusion, and stated that when she showed the notebook to Winter it only had a partial

year's report because she had only been working on it for a few days and had only

printed a few reports. She did not know if that system would work well for her, so that

is why it was only partially complete. Under the judgment section, Plaintiff stated that

when she was hired, her duties were being outsourced to many different people, and it

took her time to reach out to those people and have them help her understand what the

job entailed. She also noted, in regard to projects not getting done, specifically grant

applications, that she had attended a workshop related to grant applications, that the

projects in question required a "very long process," and that she had since submitted to

Winter a list of ten foundations for grant applications.

  With regard to professional relationships, concerning the 2015 competition

Plaintiff stated that the details of the event were only finalized a few days before, and

that she had been in California attending an ethics conference. Additionally, she did not

have the resources that CPRBS had used in the past to help with the competition.

Regarding third-party stakeholder interactions, the only interaction that might have

been negative that Plaintiff could recall involved asking a guest lecturer, who had

changed her planned power point presentation, if she wanted to provide the

videographer who was recording the live lecture with the latest copy of her

presentation, and the stakeholder did not have one available. Plaintiff apologized if this

caused confusion or the wrong impression.

Plaintiff also provided a response to the December 22, 2015, evaluation. In this response, Plaintiff noted that her skills in financial data analysis were growing, and that she had reached out to the five or six staff members who had responsibilities for her duties before she was hired, to ensure accuracy and continuity in her job performance and to ensure that she was properly following federal and state law, as well as University policy. Plaintiff then stated that the follow-up December evaluation was a "regurgitation" of the September evaluation, and did not acknowledge the progress she made. She stated that she could not improve when the language used to describe her deficiencies was so vague and subjective.

Plaintiff must show that she was meeting her employer's legitimate expectations at the time of her termination. *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). Based on the evidence in the record, Plaintiff cannot show a genuine issue of material fact that she was meeting her employer's legitimate expectations. Defendant has detailed numerous, specific instances from the evaluations where Plaintiff's job performance was severely lacking, such as interacting with the third-party stakeholders, having complete financial records, and inability to meet deadlines without sacrificing accuracy and quality in her work. Plaintiff has argued that these alleged deficiencies were subjective, but that is not the case for all of the problems listed. For example, Plaintiff's supervisors cited her failure to provide assignments or direction to two students she was supervising while she went on vacation, as well as failing to make arrangements for the students to complete their time cards so they could

be paid. Plaintiff had no response to this allegation. Plaintiff also had no response to the evaluations' citation of her inability to meet deadlines, besides arguing that it was too much work since her duties had been done by multiple people in the past. Plaintiff did not recall poor interactions with third-party stakeholders, and chalked the only interaction she could remember up to "confusion." Plaintiff's response that some of the tasks were too time-consuming speaks to an inability to do the job and meet her employer's expectations. While Plaintiff cites Peecher's admission that Plaintiff's actual job duties differed from the job description for her position, Plaintiff omits the fact that the reason for the discrepancy, according to Peecher, was that they quickly discovered Plaintiff could not perform the job duties in question.

Further, it should be noted that Plaintiff has not borne her burden of producing *some* evidence that she was meeting her employer's legitimate expectations, besides her own defenses of her job performance, such as positive evaluations or recommendations from other employees/supervisors. See *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 743 (7th Cir. 1999). Plaintiff listed as an additional fact that, from 2001 through 2008, she received outstanding performance evaluations, accolades, and praise from her supervisor, Sandy Frank. However, the legitimate expectation element of the *prima facie* case is concerned only with whether Plaintiff was meeting her employer's legitimate expectations *at the time of her termination*. See *Naik*, 627 F.3d at 600. Moreover, Plaintiff received that positive feedback when she was employed in an entirely different position with different job duties. Based on the criticisms in the evaluation, and Plaintiff's

26

response to those criticisms, the court cannot say that she was meeting her employer's legitimate expectations.[2]

2.      Similarly Situated Comparators

Even if Plaintiff could be said to have been meeting her employer's legitimate expectations, or if the legitimate expectations factor is unnecessary because Plaintiff accuses Peecher and Winter of being the ones who discriminated against her, she would still need to show that similarly situated employees not in the protected class were treated more favorably. See *McKinney*, 866 F.3d at 807. Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way. *Coleman v. Donohue*, 667 F.3d 835, 846 (7th Cir. 2012). So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied. *Coleman*, 667 F.3d at 846. There must be enough common factors to allow for a meaningful comparison in order to divine whether intentional

---

[2]For essentially these same reasons, even were the court to find that Plaintiff has made a *prima facie* case, which it does not, Defendant has advanced a legitimate, non-discriminatory reason for Plaintiff's non-renewal of employment. Further, Plaintiff has provided no evidence that such an explanation is a pretext on Defendant's part, *i.e.* a "lie." See *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext "'means a lie, specifically a phony reason for some action.'"). The court has already determined that Plaintiff's responses to the evaluations do not create a genuine issue of material fact to whether she was meeting her employer's legitimate expectations, and they likewise fail to create a general issue of material fact as to whether Defendant's explanation for her non-renewal is pretextual. See *Weihaupt v. American Medical Association*, 874 F.2d 419, 428 (7th Cir. 1989).

discrimination was at play, which, in the usual case, means a plaintiff must at least show that the comparators (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman*, 667 F.3d at 847. Still, this is not a "magic formula," and the similarly situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. *Coleman*, 667 F.3d at 847.

Plaintiff identified, in Answers to Interrogatories, three individuals as persons similarly situated to her who were treated more favorably: Kari Cooperider; Shelley Campbell; and Lorena Nichols. During her deposition, in answer to the question "[t]he people that you named as similarly situated were paid differently because they had jobs that were different from your jobs, correct?" Plaintiff answered "Yes."

Kari Cooperider, a female Caucasian, was an employee within the College of Business who served as Associate Director in the Office of Administrative Services. She was responsible for facilities scheduling and management from August 16, 2011, until February 16, 2015, when she became Director of Facility Management within the College of Business. Cooperider has never had Peecher or Winter as supervisors. She has had job duties and responsibilities different from Plaintiff throughout her career at the University. Cooperider reported to Elliott from 2011 to 2018. The types of activities that Cooperider performed within the College of Business were different and unrelated

28

to the types of activities performed by Plaintiff during the time periods referenced above.

Shelley Campbell has a master's degree in finance, a different educational field than Plaintiff. During the time that Elliott was employed by the College of Business, Campbell's responsibilities as an employee of the college were all within the Department of Finance. Campbell was the Director of Administration in Finance from August 16, 2010, until January 16, 2015, when she became Executive Director of Administration for the department. During these time periods she was supervised by Charles Kahn and later by Louis Chan. Campbell was never supervised by Winter or Peecher and, at all relevant times, her job duties and responsibilities were different from those of Plaintiff.

Lorena Nichols was the Associate Director of the Master of Science in Finance program in the Department of Finance until March 15, 2015, when she became the Senior Associate Director of the same program. From 2010 through August 15, 2016, Nichols was supervised by Shelley Campbell. Starting on August 16, 2016, Nichols became the Director of Academic and Student Services in the Business Graduate Programs office in the College of Business, where she was supervised by Jeff Beavers. Nichols had different job responsibilities than Plaintiff, and was never supervised or evaluated by Peecher and/or Winter.

The similarly-situated requirement normally entails the existence of a common supervisor, but what this actually means is whether the comparators were treated more

29

favorably by the same *decisionmaker*. *Coleman*, 667 F.3d at 847-48. Thus, even if a plaintiff and the comparators have different direct supervisors, the key inquiry as to a common "supervisor" is whether they have in common the person is who is ultimately responsible for the contested decision. *Coleman*, 667 F.3d at 848.

Based on the declaration of Susan Elliott, and the deposition testimony of Mark Peecher and Gretchen Winter, the ultimate decisionmakers as to whether Plaintiff would remain in her job at CPRBS were Peecher and Winter.[3] Peecher and Winter evaluated Plaintiff, concluded that her job performance was not satisfactory, and sent a request to the Board of Trustees on behalf of the CPRBS that a "notice of non-appointment" for Plaintiff be approved. Therefore, Peecher and Winter are Plaintiff's "supervisors" for purposes of the similarly situated analysis.

Plaintiff has provided no evidence that Peecher and Winter served in a similar capacity for any of the three comparators listed, whether it be Kari Cooperider (never had Peecher or Winter as supervisors), Shelley Campbell (supervised by Charles Kahn and Louis Chan), or Lorena Nicholas (supervised by Shelley Campbell). In fact, Plaintiff makes no argument in her Response (page 12) that she had the same supervisors as the comparators, besides stating that all three also worked for the College of Business. Thus, Plaintiff did not have the same supervisors as her comparators.

---

[3] *See* Winter Declaration, Exhibit 1 to Defendant's motion (#38), at ¶¶ 6, 11-12, and Peecher deposition, Exhibit 8, to Defendant's motion (#38), at pp. 72, 78.

For the next factor, the question is not whether the employer classified the comparators in the same way, but whether the employer subjected them to different employment policies. *Coleman*, 667 F.3d at 848.  In cases involving the quality of job performance, a would-be comparator's professional role may be so different from the plaintiff's as to render the comparison effectively useless. *Coleman*, 667 F.3d at 849. Where the issue is the quality of a plaintiff's work, a difference between the plaintiff's and comparators' positions can be important because this difference will often by itself account for the less favorable treatment of the plaintiff. *Coleman*, 667 F.3d at 849.

Plaintiff's argument is that she was discriminated against because she was fired for allegedly poor job performance, whereas the three Caucasian comparators were not. Thus, a key question is the similarity between Plaintiff and her comparators' professional roles. See *Coleman*, 667 F.3d at 849.

Defendant has provided evidence, in its Statement of Undisputed Material Facts, that all three comparators had "different job duties and responsibilities" throughout their careers at the University from Plaintiff. Cooperider worked in the Office of Administrative Services, and later as Director of Facility Management in the College of Business, where "the types of activities that she performed within the College of Business were different and unrelated to the types of activities performed by [Plaintiff] during the time periods referenced [.]" Both Campbell and Nichols worked in the Department of Finance, a different department from Plaintiff's CPRBS. Plaintiff, in her Response, states only that "Cooperider and Nicholas work for the College of Business

31

and have similar backgrounds insofar as education, and also have similar job duties to

Plaintiff." Plaintiff has the burden of proving a *prima facie* case of employment

discrimination. See *Young v. United Parcel Service, Inc.*, 191 S.Ct. 1338, 1353-54 (2015);

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Plaintiff

has presented no competent evidence to meet her burden that she had similar

professional roles to her proposed comparators. She cannot meet her burden on this

factor.

   To satisfy the third factor, Plaintiff must show that the comparators "engaged in

similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them." See *Gates v. Caterpillar,

Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). Plaintiff has made no such showing. All Plaintiff

states, in her Response at page 12, is "[m]ore importantly, and unrefuted by the

Defendant, none of these individuals suffered the same level of adverse employment

action as that of the Plaintiff." This may be true, but Plaintiff has not shown, in any

degree, how those comparators engaged in similar conduct to Plaintiff. Plaintiff must

present competent evidence in order to survive summary judgment. *Butts*, 387 F.3d at

924. She has not done so.

   Because Plaintiff has produced no evidence that she: (1) had the same

supervisors as the comparators (in fact, the evidence is to the contrary); (2) was subject

to the same standards of conduct (again, the evidence is to the contrary); and/or (3) that

comparators engaged in the same conduct and/or conducted their job in a similar

manner as Plaintiff (complete absence of competent evidence), the court finds that

Plaintiff has not met her burden in making out a *prima facie* case of employment

discrimination. See *Coleman*, 667 F.3d at 847. The court finds that the evidence adduced

in this case would not permit a reasonable factfinder to conclude that the plaintiff's race

or national origin caused her discharge, and therefore judgment is granted in

Defendant's favor on Counts I and II. See *McKinney*, 866 F.3d at 807.


### *Count III: Gender Discrimination*

Defendant next moves for summary judgment on Plaintiff's claim of gender

discrimination under Title VII. Defendant argues that Plaintiff's claim is time barred

and, even if it is not, she cannot establish gender discrimination based on the evidence

produced in discovery.

<u>Whether the Claim is Time Barred</u>

Defendant argues that Plaintiff's gender discrimination claim is time barred

because she did not file her September 12, 2016, EEOC complaint within 300 days of the

claimed discrete discriminatory act, in that the only gender discrimination complained

of related to Professor Mahoney's harassment in the fall of 2014. Plaintiff responds that

the alleged gender discrimination in her ODEA complaints of October 12, 2015, and

January 8, 2016, was a "continuing violation," and thus would be within the 300 day

window for filing a timely complaint.

A Title VII plaintiff normally must first file a charge with the EEOC within a specified period of time after the challenged employment action occurs. The applicable limitations period for filing a charge varies depending on whether the state in question has an agency empowered to address employment discrimination. *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014). Illinois has such an agency (IDHR), and thus if an Illinois plaintiff does not file a charge concerning a discrete act of discriminatory conduct within 300 days of its occurrence, the claim is time barred and the plaintiff may not recover. *Roney v. Illinois Department of Transportation*, 474 F.3d 455, 460 (7th Cir. 2008). Because Plaintiff's EEOC charge was filed on September 12, 2016, any discrete acts that occurred more than 300 days prior to this date, or before November 16, 2015, cannot be the basis of her Title VII claims. See *Roney*, 474 F.3d at 460.

Defendant argues that the only alleged gender discrimination referenced in Plaintiff's Amended Complaint is Mahoney's harassment from summer/fall 2014, and thus it cannot serve as the basis for a timely EEOC complaint. Plaintiff responds that Mahoney's harassment was "background evidence" in support of her timely Title VII claim, because she complained to ODEA of gender discrimination in January 2016. Plaintiff argues that under the continuing violation doctrine, Mahoney's harassment can and should be linked to gender discrimination she suffered within the limitations period. Plaintiff also argues that equitable tolling should apply to preserve her claim.

34

Under the "continuing violation" doctrine, a Title VII plaintiff may recover for otherwise time barred conduct that is part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period. *Barrett v. Illinois Department of Corrections*, 803 F.3d 893, 898 (7th Cir. 2015), citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116–18 (2002). However, as the Supreme Court clarified in *Morgan*, this doctrine is limited to claims of a hostile work environment, because "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Barrett*, 803 F.3d at 898, quoting *Morgan*, 536 U.S. at 115. The theory is that a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," and, as such, a Title VII claim for a hostile work environment is timely as long as any act falls within the statutory time period, even if the claim encompasses events occurring prior to the statutory time period. *Barrett*, 803 F.3d at 898-99.

This reasoning applies to hostile work environment claims only, and a Title VII plaintiff claiming a series of discrete discriminatory acts cannot avoid the effect of the limitations period by arguing that the discrete acts are "plausibly or sufficiently related." *Adams*, 742 F.3d at 730. "To the contrary, *Morgan* holds that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Adams*, 742 F.3d at 730, quoting *Morgan*, 536 U.S. at 113.

35

Based on Count III of the Amended Complaint, Plaintiff has not made a hostile work environment claim. The elements of a Title VII hostile work environment charge are: (1) the work environment must have been both subjectively and objectively offensive; (2) the plaintiff's gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). Plaintiff did not plead such a claim. Rather, Plaintiff plead a standard Title VII disparate treatment gender discrimination claim. The elements of a Title VII gender discrimination claim are that the plaintiff: (1) is a member of a protected class, (2) is performing her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated less favorably than at least one similarly-situated male colleague. *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005).

Here, Plaintiff titled Count III "Violation of Title VII- Gender Discrimination." Plaintiff alleged that she was a member of a protected class, performed her job duties in a manner consistent with her employer's legitimate expectations, suffered numerous adverse employment actions as a result of her gender, and that the University discriminated against her and other similarly situated female workers by treating them differently and less preferably than their similarly situated male colleagues by subjecting them to lesser pay and benefits and discriminatory terms and conditions of employment. Plaintiff's Count III from the Amended Complaint is a gender discrimination claim, not a hostile work environment claim, and thus the continuing

36

violation doctrine does not apply and the claim is time barred. See *Adams*, 742 F.3d at 730.

Plaintiff, in her Response, appears to be attempting to turn her claim in Count III into a hostile work environment/harassment claim, which would make the continuing violation rule applicable. Plaintiff, in her Additional Fact #6, states that after reporting the October 3, 2014, incident with Mahoney, Susan Elliott and Gretchen Winter "continued to" harass her, but makes no argument and produces no evidence as to *how* exactly the harassment was tied to reporting Mahoney. In order to show gender based harassment or a hostile work environment claim under Title VII, Plaintiff must show that (1) her work environment was both objectively and subjectively offensive; (2) the harassment she complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there was a basis for employer liability. *Passananti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012). Plaintiff testified that she was "yelled at" by Winter and micromanaged, but she in no way explains how that is related to reporting Mahoney's behavior or to her gender, as opposed to a critique of her work performance. Further, she claims that someone "prevented her from being considered for other positions that were available," but admitted that she did not know who was keeping her from being considered for the positions, and that the searches were simply closed "without hire."

Even taking a generous view of Plaintiff's argument, the very limited evidence provided by Plaintiff in support of her claim cannot be characterized as "severe or

pervasive," and cannot be connected to her gender. See *Passananti*, 689 F.3d at 664;

*Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 899 (7th Cir. 2018) ("A

supervisor who nitpicks, micromanages, and holds employees to unreasonable

standards is simply a bad boss. It is only if she applies this poor management unequally

based on race that a plaintiff has a claim for race discrimination."). Judgment is granted

for Defendant on Count III.[4] Plaintiff did not plead a hostile work environment claim,

and the evidence at summary judgment does not demonstrate a genuine issue of

material fact with respect to such a claim. The only competent evidence of gender based

discrimination cited by Plaintiff is Mahoney's 2014 harassment, a discrete act more than

300 days before the EEOC complaint was filed, and is thus time barred.

Nor does equitable tolling apply in this situation. "The Supreme Court has

cautioned that equitable tolling in the context of Title VII is 'to be applied sparingly.'"

*Beamon v. Marshall and Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005), quoting *Morgan*,

536 U.S. at 113.  The doctrine may extend the statute of limitations if, despite all due

diligence, a plaintiff cannot obtain the information necessary to realize that she may

possibly have a claim. *Beamon*, 411 F.3d at 860. Equitable tolling requires a court to

consider whether a reasonable person in the plaintiff's position would have been aware

---

[4]To the extent that Plaintiff is trying to assert that Winter and Elliott continued to harass her for making the complaint about Mahoney, and that actions taken against her up to and including her termination in 2016 were because of her complaint about Mahoney, that would be evidence of retaliation, but not evidence of separate discrimination on their part aimed at Plaintiff because of her gender. Retaliation and discrimination based on gender are two discrete claims, with two discrete analyses, as explained above in the section on Counts I and II.

of the possibility that she had suffered an adverse employment action because of illegal discrimination. *Beamon*, 411 F.3d at 860-61.

It should be noted that, while Plaintiff on page 15 of her Response recites general legal principles regarding equitable tolling and estoppel[5], she makes no actual argument as to why equitable tolling should be applied to her gender discrimination claim. She cites no facts in evidence, and makes no argument tying those facts to the equitable tolling doctrine, to demonstrate why tolling should apply. Undeveloped and unsupported perfunctory arguments need not be considered on summary judgment. *YCB International, Inc. v. UCF Trading Co., Inc.*, 904 F.Supp.2d 870, 883 (N.D. Ill. 2012); *M.G. Skinner and Associates Insurance Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Even on the merits, an equitable tolling argument would fail, as Plaintiff claimed in her deposition that she was subject to harassment and actions by Winter soon after reporting Mahoney in 2014. She also received her first negative evaluation in September 2015. Plaintiff filed a complaint with the ODEA on October 12, 2015, alleging discrimination. There was nothing in the record demonstrating Plaintiff would not have

---

[5]Plaintiff argued equitable tolling and estoppel could apply to overcome the 300 day requirement. Equitable estoppel, however, only comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations. *Hentosh v. Herman M. Finch University of Health Sciences/The Chicago Medical School*, 167 F.3d 1170, 1174 (7th Cir. 1999). Plaintiff has provided no evidence, or even any argument, showing that Defendant took any such steps to prevent Plaintiff from suing in time.

been aware of the possibility that she had suffered an adverse employment action
because of illegal discrimination before November 16, 2015, based on her claims. See
*Beamon*, 411 F.3d at 860-61. Equitable tolling does not apply.

<u>No Evidence of Gender Discrimination</u>

Defendant argues that, even if Plaintiff's gender discrimination claim is not time
barred, judgment must still be granted in its favor because, just as with the
racial/national origin discrimination claim, Plaintiff has produced no competent
evidence that her non-renewal/poor evaluations in late 2015 and early 2016 were due to
gender discrimination on behalf of Defendant.[6] In support, Defendant refers to the same
argument and facts discussed in relation to racial/national origin discrimination claims.
Plaintiff, in her Response, has failed to respond to Defendant's argument, and has thus
has waived any argument in opposition to Defendant's motion on that ground. See
*Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013); *Bonte v. U.S. Bank,
N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Thomas v. Kroger*, 2014 WL 555086, at *1 (S.D. Ind.
Feb. 12, 2014).

Plaintiff may have intended for her response regarding intentional
discrimination for the race/national origin claims in Counts I and II to cover her
response to Defendant's arguments on the merits of the gender discrimination claim. If

---

[6]This concerns Plaintiff's allegations that the poor performance evaluations
conducted by Winter and Peecher in late 2015, and their decision to not renew Plaintiff's
employment in 2016, was based on gender discrimination. This analysis does not
concern any claim regarding retaliation against Plaintiff for her complaint about
Mahoney.

that is the case, then for the same reasons the court found that judgment should be granted in Defendant's favor on those claims, the court finds that judgment should be granted in Defendant's favor on Plaintiff's Count III claim that she was discriminated against based on her gender when she was terminated by the University in 2016.

*Count IV: Retaliation*

In Count IV of her Amended Complaint, Plaintiff alleges that she was retaliated against by Defendant because she (1) filed a complaint with ODEA on October 3, 2014, about Mahoney's harassment and (2) filed a second ODEA complaint on October 12, 2015, alleging discrimination based on race, national origin, and gender. Plaintiff alleges that she was retaliated against by her employer for engaging in this protected activity because (1) she was given several negative evaluations in September and December 2015 and (2) she was notified that her contract would not be renewed on April 7, 2016. Plaintiff alleges that there is a causal connection between the protected activity and the adverse employment actions.[7]

Defendant contends that the evidence does not show a causal connection between statutorily protected activity and adverse employment actions. Plaintiff counters that the timing of the adverse employment actions, coming immediately after she engaged

---

[7]Plaintiff also alleged that similarly situated non-complaining and/or non-charge filing employees were treated more favorably than her. To the extent those employees are Cooperider, Campbell, and Nichols, the court has already determined that they are not similarly situated to Plaintiff. Plaintiff has failed to provide any other similarly situated employees.

in the protected activity, creates a genuine issue of material fact as to whether she was improperly retaliated against by Defendant.

Title VII prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), citing 42 U.S.C. § 2000e–3(a). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord*, 839 F.3d at 563. A retaliation claim requires proof of causation, which in this context means but-for causation. *Lord*, 839 F.3d at 563. The inquiry in this regard is straightforward: does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge. *Lord*, 839 F.3d at 563.

Plaintiff, here, relies entirely on suspicious timing to support her claim of retaliation. Suspicious timing by itself will rarely support an inference of retaliation, but it may do so "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Lord*, 839 F.3d at 563, quoting *Culver v. Gorman & Company*, 416 F.3d 540, 546 (7th Cir. 2005). The court will examine each alleged protected activity engaged in by Plaintiff, and determine whether an adverse employment action occurred, and whether the protected activity was the but-for cause

42

of that action. Between her Amended Complaint and Response Plaintiff identifies four instances of protected activity: (1) the October 3, 2014 complaint to ODEA about Mahoney; (2) her September 14, 2015, complaint to the OEC about the CBA; (3) her October 12, 2015, ODEA complaint alleging discrimination; and (4) her January 8, 2016, ODEA complaint alleging discrimination.

October 3, 2014 ODEA Complaint

Defendant argues that the October 3, 2014, ODEA complaint was not causally connected to any adverse employment action. Plaintiff has failed to respond to this argument, and thus has waived any opposition to it. See *Goodpaster*, 736 F.3d at 1075; *Bonte*, 624 F.3d at 466; *Thomas*, 2014 WL 555086, at *1. Still, even if the court were to find opposition not waived, there is no causal connection to any adverse employment action. The court already noted that the alleged harassment by Elliott and Winter (yelling at Plaintiff, micromanaging her) did not amount to a hostile work environment, and, here, would not amount to any sort of adverse employment action. Further, the allegation that she was denied promotion or other employment opportunities does not suffice, because Plaintiff could not even say who was keeping her from getting those positions, and they were closed "without hire." Most importantly, Plaintiff has provided zero evidence that this "harassment" was connected in any way with her 2014 complaint over Mahoney.

43

This leaves Plaintiff only with "suspicious timing" as it relates to her poor performance evaluations[8] in the fall/winter of 2015 and termination in April 2016. Plaintiff made her complaint in October 2014, the first evaluation was not until September 24, 2015, the second evaluation was on December 22, 2015, and she was notified of her non-renewal on April 7, 2016. This means that the soonest adverse employment action occurred more than eleven months after the protected activity. The Seventh Circuit has held that, in a case of suspicious timing alone, a lapse of six months between a complaint and adverse employment action, and even a lapse of *five weeks*, is, by itself, insufficient to support an inference of causation. See *Skylarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (six months); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966–67 (7th Cir.2012) (concluding that five week lapse alone does not support inference of causation). Plaintiff has not demonstrated a genuine issue of material fact exists as to whether she was retaliated against for the October 3, 2014 complaint.

<u>September 14, 2015 OEC Complaint</u>

The September 14, 2015, OEC complaint concerned possible misuse of funds by Winter over the CBA account. It included no claims that Plaintiff was being discriminated against or harassed based on her race, national origin, or gender.

---

[8]It should also be noted that poor performance evaluations by themselves cannot be the basis for a finding of an adverse employment action by the employer. *Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016); *Smart v. Ball State University*, 89 F.3d 437, 441-42 (7th Cir. 1996). However, the court will consider the timing of the evaluations for the sake of argument and in the context of Plaintiff's eventual termination in April 2016.

44

Section 2000e–3(a) does not protect employees for opposing all adverse actions by their employers but rather only for opposing certain practices that have been "made an unlawful employment practice" by federal law. These practices encompass discrimination on the basis of race, color, religion, sex, and national origin. § 2000e–2. That is, in order for employees to establish a retaliation claim, they must show that they actually communicated to their employer a belief that the employer has engaged in status-based discrimination. See *Crawford v. Metro. Government of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276–77 (2009). Employees must actually take a "stand against an employer's discriminatory practices." *Id.* at 277.

The reason for this requirement is that federal courts do not sit as appellate human-resources departments. Federal law protects an employee's right to oppose discrimination only on the basis of certain protected "personal characteristics," [citation omitted]; it does not protect any right to oppose employer harassment generally. "It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutory protected activity." *Durkin v. City of Chi.*, 341 F.3d 606, 614–15 (7th Cir. 2003). "An employer cannot retaliate if there is nothing for it to retaliate against." *Id.* at 615. In other words, if "the workplace is unsavory for any reason other than hostility on the basis of race, gender, ethnicity, or religion, no federal claim is implicated." *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Especially relevant here is the Seventh Circuit's holding that "personality conflicts ... are not the business of the federal courts." *Id.*

*Gomez v. Federal Express, Inc.*, 72 F.Supp.3d 902, 908 (N.D. Ill. 2014).

Plaintiff could be said to be engaging in whistleblowing activity about financial impropriety by a superior in the September 14, 2015 OEC complaint, but she is not engaging in a protected activity under Title VII, *i.e.* she is not complaining about harassment or discrimination based on gender, race, national origin, etc. Plaintiff has

45

not demonstrated a genuine issue of material fact exists as to whether she was retaliated

against in violation of Title VII for the September 14, 2015 complaint.[9]

October 12, 2015 ODEA complaint

The next complaint at issue is Plaintiff's October 12, 2015 ODEA complaint,

where she claims she complained to Jennie Duran about discrimination based on race,

marital status, and age. Duran's notes indicate that Plaintiff later stated that she did not

feel it was due to being part of a protected class that she received a poor evaluation

from Winter, but rather because of the stress put on Winter by the OEC investigation of

the CBA account and a personality conflict between the two of them. Plaintiff disputes

this, testifying that those were Duran's words not hers. The court finds this to be a

genuine dispute of material fact. Therefore, the court will find, for summary judgment

purposes, that the October 12, 2015 ODEA complaint was a protected activity.

Plaintiff cannot, however, establish a causal connection between the complaint

and any adverse employment action. Again, Plaintiff relies entirely on suspicious

timing to support an inference of a causal connection. First, the September 24, 2015

evaluation came before the October 12 ODEA complaint, and thus cannot support a

causal inference. See *Leitgen v. Franciscan Skemp Health Care, Inc.*, 630 F.3d 668, 676 (7th

Cir. 2011) (When a retaliation claim is based on suspicious timing, "the order of events

---

[9]This analysis and conclusion also applies to the September 23, 2015, meeting of
McNeely and Elliott. It concerned Plaintiff's whistleblower claims of financial
improprieties, not any claim of discrimination or engagement in protected activities
under Title VII. Plaintiff has produced no evidence to the contrary.

is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.").

Second, the December 22, 2015 evaluation occurred more than two months after the ODEA complaint. The Seventh Circuit has held that five weeks or a month between the protected activity and adverse employment action, without more, is insufficient to support an inference of a causal connection. See *Kidwell*, 679 F.3d at 966–67 (five weeks); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (even one month interval not close enough in time when the plaintiff fails to meet his burden to put forth other evidence that suggests that his protected activities were in any way linked to his termination).

Even were the court to consider the suspicious timing sufficient, there is substantial evidence that Plaintiff would have received poor performance evaluations and been terminated from her position even absent her complaints to ODEA. "When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment." *Lord*, 839 F.3d at 564. If a defendant can make that showing, then the alleged retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm. *Lord*, 839 F.3d at 564. Of course, an employer's proffered justifications are always susceptible to attack, and a plaintiff can avoid summary judgment if a

material factual dispute exists on the question of pretext, as summary judgment is appropriate only if a reasonable fact finder would be compelled to believe the defendant's explanation. *Lord*, 839 F.3d at 564.

As the court has noted, the relevant performance evaluations list many nonretaliatory reasons for the University's decision to not renew Plaintiff's contract. These include severe deficiencies in Plaintiff's job performance concerning her knowledge, judgment, productivity, professional relationships, organization, reliability, and supervision. Plaintiff was given three months to improve on these deficiencies, she did not, and was ultimately terminated from her position.

Plaintiff has no evidence that calls Defendant's proffered explanation for the adverse employment actions into question. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action. *Lord*, 839 F.3d at 564. When assessing a plaintiff's claim that an employer's explanation is pretextual, the court cannot second-guess the employer's facially legitimate business decisions. *Lord*, 839 F.3d at 564. An employer's reasons for firing an employee can be foolish or trivial or even baseless, but as long as they are honestly believed, they are not pretextual. *Lord*, 839 F.3d at 564.

Plaintiff points to her responses to the performance evaluations, but those responses quibble with the evaluation's conclusions and offer justifications for Plaintiff's poor performance. They do not cast doubt on the sincerity of Peecher and Winter's evaluation of Plaintiff's job performance and her ultimate ability to do that job.

Plaintiff claims that her responses to the evaluations were a "comprehensive rebuttal" demonstrating that she was proficient in her job performance, and states that this rebuttal was never adequately considered or engaged with by Peecher and Winter. Plaintiff has only her own assertions and justifications in support of her contention that she was performing her job satisfactorily and that Winter and Peecher's stated reasons for her poor evaluations and eventual termination are a pretext. However, a plaintiff must do more than challenge the judgment of her superiors through her own self-interested assertions, because the employee's perception of herself is not relevant, but rather "it is the perception of the decision maker which is relevant." *Weihaupt v. American Medical Association*, 874 F.2d 419, 428 (7th Cir. 1989). Whether Peecher and Winter's evaluation of Plaintiff was wise or warranted is beside the point, because what matters is whether they honestly believed what they put in the evaluations, and Plaintiff has no evidence that they did not. See *Lord*, 839 F.3d at 564-65.

Further, Plaintiff cannot show that Winter and Peecher, the two responsible for the adverse employment action, *knew* of the protected conduct. See *Lord*, 839 F.3d at 563 (suspicious timing alone may be sufficient for causal connection when "an adverse employment action follows on the close heels of protected expression and the plaintiff can show *the person who decided to impose the adverse action knew of the protected conduct*") (emphasis added). Plaintiff has no evidence that Peecher knew of the October 12, 2015 ODEA complaint. Both Peecher and Winter testified in their depositions that they did

49

not become aware of the ODEA or ethics complaints until the filing of this lawsuit (September 2016).

Plaintiff, in her Additional Facts, states that Winter, in December 2015, entered Plaintiff's office and asked Plaintiff what she was doing and why Plaintiff had done the things she had done, "alluding to the OEC and ODEA complaints[,]" and that Winter stated that she did not care what the state had to say, as private funds paid her salary and not the state. However, examining Plaintiff's testimony in that regard, Winter never actually said anything about the ODEA complaint. If anything, it could be read as a reference to the OEC complaint concerning handling of the CBA account, which, as noted above, is not protected activity for Title VII purposes.

Plaintiff has provided no evidence that Peecher and Winter were aware of any protected activity that Plaintiff engaged in when they conducted her performance evaluations and later recommended that Plaintiff not be retained. Plaintiff has not demonstrated a genuine issue of material fact exists as to whether she was retaliated against in violation of Title VII for the October 12, 2015 ODEA complaint.[10]

---

[10]The court would also note that Winter's December 2015 comments to Plaintiff were several months after Plaintiff's negative September 24, 2015 evaluation.

<u>December 22, 2015 and January 8, 2016 ODEA Complaints</u>

For same reasons stated above with regard to the October 12, 2015, ODEA complaint, Plaintiff cannot demonstrate that she was retaliated against for contacting the ODEA on December 22, 2015, and January 8, 2016. According to Plaintiff's testimony, and the order of events as plead in her Amended Complaint at paragraphs 35 and 36, Plaintiff received the negative December 22, 2015 performance evaluation and *then* contacted ODEA, alleging retaliation/discrimination. Therefore, with regard to this second ODEA complaint, the adverse employment action in question would have to be Plaintiff's notice of non-renewal on April 7, 2016.

First, again, Plaintiff only has suspicious timing for evidence of retaliation over a protected activity, and the alleged protected activity in question occurred on December 22, 2015, or January 8, 2016 (when Plaintiff followed up with an in-person visit to ODEA). At the very least, nearly three months separated the activity from the employment action, too long a time for suspicious timing alone to suffice for a causal connection. See *Kidwell*, 679 F.3d at 966–67; *Harper*, 687 F.3d at 308.

Second, for the same reasons stated above, Plaintiff cannot rebut Defendant's nonretaliatory, legitimate reasons for taking the adverse employment action (Plaintiff's poor work performance), and further cannot demonstrate, with competent evidence, that Peecher and Winter knew of any protected activity on Plaintiff's behalf (*i.e.*, Plaintiff's October 12, 2015 and December 22, 2015 complaints to the ODEA that Winter

and Peecher were racially/sexually discriminating against her). See *Lord*, 839 F.3d at 563-65. Summary judgment is granted in Defendant's favor on Count IV.

## CONCLUSION

In sum, Plaintiff cannot demonstrate that a genuine issue of material fact exists as to whether Defendant discriminated or retaliated against her in violation of Title VII. The evidence produced in discovery and submitted by the parties at summary judgment would not permit a reasonable factfinder to conclude that the plaintiff's race, national origin, or gender caused her poor performance evaluations or discharge. See *McKinney*, 866 F.3d at 807. Nor does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused her poor evaluations or discharge. See *Lord*, 839 F.3d at 563.

IT IS THEREFORE ORDERED:

(1)     Defendant's Motion for Summary Judgment (#38) is GRANTED in full. Judgment is entered in favor of Defendant and against Plaintiff.

(2)     The final pretrial and jury trial dates are hereby VACATED.

(3)     The pending Motions in Limine (#45, 46) are MOOT.

(4)     This case is terminated.

ENTERED this  17th  day of   December  , 2018.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE

E-FILED
Monday, 17 December, 2018  05:05:17 PM
Clerk, U.S. District Court, ILCD

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | | |
|---|---|---|
| **ALEJANDRA AGUERO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case Number: 16-cv-2298** |
| | ) | |
| **UNIVERSITY OF ILLINOIS,** | ) | |
| **BOARD OF TRUSTEES OF** | ) | |
| **UNIVERSITY OF ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT IN A CIVIL CASE

☐  **JURY VERDICT.**    This action came before the Court for a trial by jury.    The issues have been tried and the jury has rendered its verdict.

☒  **DECISION BY THE COURT**.    This action came before the Court, and a decision has been rendered.

   **IT IS ORDERED AND ADJUDGED** that plaintiff's action against the defendants is dismissed .

**Dated:    December 17, 2018**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court